UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| BRANDON COOPER, *et al.*, | * | CIVIL ACTION |
| | * | |
| Plaintiffs, | * | NO. 3:14-cv-00507-SDD-RLB |
| | * | |
| vs. | * | JUDGE DICK |
| | * | |
| DR. COURTNEY N. PHILLIPS, *et al.*, | * | MAGISTRATE JUDGE BOURGEOIS |
| | * | |
| Defendants, | * | |
| | * | |
| *Consolidated with* | * | |
| | * | |
| ADVOCACY CENTER and MONICA JACKSON, | * | CIVIL ACTION |
| | * | |
| | * | NO. 3:15-cv-00751-SDD-RLB |
| Plaintiffs, | * | |
| | * | JUDGE DICK |
| vs. | * | |
| | * | MAGISTRATE JUDGE BOURGEOIS |
| DR. COURTNEY N. PHILLIPS, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## OPPOSITION TO PLAINTIFFS' MOTION TO REOPEN DISCOVERY AND RULE TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

Dr. Courtney N. Phillips, Secretary of the Louisiana Department of Health, and the Louisiana Department of Health (hereinafter collectively referred to as Defendants or LDH) respectfully submit this Opposition to Plaintiffs' *Motion to Reopen Discovery and Rule to Show Cause Why Defendants Should Not Be Held In Contempt.* Plaintiffs' Motion to Reopen Discovery seeks to open the floodgates and extend the scope of discovery beyond reasonableness, by citing Settlement Agreement compliance issues admitted to by LDH arising solely from restrictions imposed due to the unforeseeable, unprecedented world-wide COVID-19 pandemic. Although all parties agree that the COVID-19 pandemic is the major driving factor for LDH's non-compliance

with the Settlement Agreement, Plaintiffs still seek for LDH to be held in contempt of the Settlement Agreement. Prior to COVID-19, LDH had been in substantial compliance with the Settlement Agreement for almost 3.5 years, and LDH remains committed to complying with the provisions set forth therein. However, LDH has had to, and will continue to make all efforts to follow Center for Disease and Control and Prevention (CDC) guidelines for congregate settings, as well as local quarantine protocols and mandates to lessen the spread of COVID-19 to protect the public, including employees working in congregate settings and individuals in congregate settings.

## I.    FACTUAL SUMMARY

On November 16, 2016, LDH and Plaintiffs reached an agreement to settle two (2) consolidated federal complaints, *Cooper* and *Jackson,* which are the subject of the matter herein. The *Cooper* plaintiffs were individuals who had been found Not Guilty by Reason of Insanity (NGRI) and ordered to Eastern Louisiana Mental Health System (ELMHS) by the criminal court. The *Jackson* plaintiffs include individuals who had been found Incompetent to Proceed and ordered to ELMHS for competency restoration services. At the time, the plaintiffs (and similarly situated individuals) were waiting in jails for bed availability at ELMHS.  As a result of these complaints, LDH and DRLA entered a Settlement Agreement[1] and agreed that wait times for NGRI and Incompetent Individuals would not exceed fifteen (15) days from the date ELMHS received the order from the criminal court ordering the individuals to ELMHS. As part of this agreement, LDH and Plaintiffs would enter into a four (4) year monitoring period to provide monthly reports on admit times for individuals on the wait list.

---

[1] ECF No. 203.

Prior to COVID-19, LDH remained in substantial compliance with the Settlement agreement from the onset of the Settlement Agreement in November 2016 to March 2020, the start of this unprecedented pandemic.[2]  Due to COVID-19, it became impossible for LDH to remain in substantial compliance with the Settlement Agreement, therefore, LDH offered to extend provisions of the Settlement Agreement to continue its monitoring and reporting monitoring/reporting periods, which Plaintiffs accepted. Further, Plaintiffs requested that LDH enter into a proposed supplemental settlement agreement to add additional stipulations to the prior Settlement Agreement. Although LDH engaged in extensive communication regarding the proposed supplemental settlement agreement, Plaintiff halted all negotiation efforts with LDH on May 7, 2021 and filed this Motion.

## II.    ARGUMENT

Plaintiffs complain that LDH has been non-compliant with the Settlement Agreement starting in March 2020, due to the onset and rapid spread of COVID-19 throughout Louisiana, and that LDH has not appropriately responded to Plaintiffs' requests for information. However, LDH has continuously worked to respond to the pandemic all while continuing to provide Plaintiffs' with the information as required pursuant to the Settlement Agreement, and continuously engaging in communications with Plaintiffs throughout this pandemic.

### A. Compliance with the Settlement Agreement During the COVID-19 pandemic became impossible.

In their motion, Plaintiffs cite to four areas of the Settlement Agreement where they allege LDH is in contempt of the Settlement Agreement:

- Providing all NGRI or Incompetent Individuals a Behavioral Health Assessment (BHA) within five (5) calendar days of notification of an order for inpatient treatment or an order of commitment;

- Admitting all new NGRI or Incompetent Individuals with Emergency Mental Health Needs to a Mental Health Facility within two (2) business days following completion of a BHA;

- Admitting all NGRI or Incompetent Individuals to the forensic unit at ELMHS or other mental health facility, or to an appropriate community-based program within 15 calendar days following receipt of an Order; and

- Creating new placement options, in addition to and not in lieu of current placement opportunities, at clinically and legally suitable locations – including community-based settings – to prevent unnecessary detention of NGRI and Incompetent Individuals in jails or confinement in Mental Health Facilities.

As noted in Plaintiffs' *Unopposed Motion for Continued Reporting and Jurisdiction Over the Settlement Agreement and Notice of Negotiations Related to a Supplemental Agreement*, the parties agree that LDH has been unable to maintain substantial compliance with the Settlement Agreement due to the ongoing COVID-19 pandemic.[3] LDH does not dispute this fact. Due to COVID-19, beginning March 16, 2020, compliance with the Settlement Agreement became impractical and impossible.

1. <u>The Exigencies of the COVID-19 Public Health Emergency Have Impacted Admissions for Emergent and Non-Emergent NGRI and Incompetent Individuals.</u>

When a criminal defendant is charged with a felony or with the crime of domestic abuse battery, and is considered by the court to be likely to commit crimes of violence, and the court has determined that his mental capacity cannot be restored within ninety days, the court must commit the defendant to the Feliciana Forensic Facility at ELMHS for recommended inpatient treatment.[4] After a defendant's commitment, if the superintendent of the mental institution reports to the committing court that the defendant has regained the mental capacity to proceed to trial, the defendant, if hospitalized, is discharged from the mental institution and released to the custody of the sheriff of the parish from which the defendant was committed pending a contradictory hearing

---

[3] ECF No. 208, at p. 2.
[4] La. C.Cr.P. Art. 648(A)(2)(a).

by the committing court on the issue.[5] It must be noted that the sheriff of the parish from which the defendant was committed must be able to take custody of the defendant if competency has been so restored in order for that discharge to occur. In other words, the parish jail must be in a position to receive the discharged criminal defendant.

The process for NGRI individuals as provided by Louisiana law, at first blush, is not dissimilar. When a verdict of not guilty by reason of insanity is returned in a capital case, the court must commit the defendant to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment.[6] When the court orders commitment to a state mental institution, that commitment is to ELMHS. When a defendant is found not guilty by reason of insanity in any other felony case and the court has determined that the defendant cannot be released without danger to others or to himself, the court must again order him committed to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment.[7] Again, when the court orders commitment to a state mental institution, that commitment is to ELMHS.

However, the admissions and discharges of NGRI or Incompetent Individuals to ELMHS do not occur in a vacuum. Since the declaration of the COVID-19 Public Health Emergency[8] in Louisiana by Governor John Bel Edwards on March 11, 2020, ELMHS has been forced several times to cease admissions to its facility over the past sixteen months. In particular, admissions to ELMHS were ceased and later restarted on the following dates:[9]

---

[5] La. C.Cr.P. Art. 649(A).

[6] La. C.Cr.P. Art. 654.

[7] *Id.*

[8] The Governor of Louisiana made this declaration pursuant to the authority of the Louisiana Health Emergency Powers Act, La. R.S. 29:760, *et seq.*, through Proclamation Number 25 JBE 2020 (March 11, 2020). The Public Health Emergency has been timely renewed since, most recently on June 22, 2021 through Proclamation Number 117 JBE 2021. The successive Proclamations issued by the Governor under the Louisiana Emergency Powers Act may be found at https://gov.louisiana.gov/index.cfm/newsroom/category/10 (last accessed on July 1, 2021).

[9] Exhibit 1 – Declaration of Hampton "Steve" Lea.

| **Halted:** | **Restarted:** | **Length of Cessation:** |
|---|---|---|
| 03/12/2020 | 7/14/2020 | 116 days |
| 10/08/2020 | 11/02/2020 | 25 days |
| 03/08/2021 | 3/22/2021 | 14 days |
| 05/26/2021 | 6/03/2021 | 8 days |

Each halt to admissions was due to either a COVID-19 outbreak in the admission units or to an exposure to persons infected with COVID-19 in the admission units at ELMHS.[10] The start of the longest of these cessation periods coincided with the onset of community spread of COVID-19 in Louisiana.[11] This first halt to admissions was taken as an aggressive action by ELMHS with LDH approval in order to control the potential for contagion among the population at ELMHS as a preventative measure. Nonetheless, these cessation periods do not illustrate the entire picture.

Outside of operations at ELMHS, the entire state of Louisiana was overwhelmed by the rapidity of spread of the pandemic. Subsequent to the declaration of the COVID-19 Public Health Emergency, the entire law enforcement and judicial system in Louisiana were completely overcome. Recognizing the need to safeguard the rights of Louisiana citizens in this crisis, Governor Edwards suspended all legal deadlines operative under the Louisiana Code of Criminal Procedure, Title 13 of the Louisiana Revised Statutes (Courts), Title 14 of the Louisiana Revised Statutes (Criminal Law), and Title 15 of the Louisiana Revised Statutes (Criminal Procedure) for three whole months from March 16, 2020 to June 15, 2020.[12] Moreover, the Louisiana Supreme Court, through its inherent authority under the Louisiana Constitution of 1974, suspended jury trials in criminal matters for three and one-half months from March 16, 2020 to June 30, 2020[13]

---

[10] Exhibit 1 – Declaration of Hampton "Steve" Lea.

[11] *See* press release "Gov. Edwards Signs Proclamation Aimed to Slow the Spread of COVID-19 in Louisiana" (March 12, 2021), available at https://gov.louisiana.gov/index.cfm/newsroom/detail/2403 (last accessed on July 1, 2021).

[12] *See* Gubernatorial Proclamations Number 30 JBE 2020 (March 16, 2020), 41 JBE 2020 (April 2, 2020), 52 JBE 2020 (April 20, 2020), 59 JBE 2020 (May 14, 2020), and 75 JBE 2020 (June 4, 2020), found at https://gov.louisiana.gov/index.cfm/newsroom/category/10 (last accessed on July 1, 2021).

[13] *See* Louisiana Supreme Court Press Releases 2020-04 (March 16, 2020), 2020-05 (March 20, 2020), 2020-07 (April 6, 2020), 2020-10 (April 22, 2020), and 2020-15 (May 15, 2020), and corresponding signed Orders, found at https://www.lasc.org/PressRoom/2020 (last accessed on July 1, 2021).

and all non-emergency in-person proceedings in all judicial matters for <u>six weeks</u> from April 6, 2020 to May 18, 2020.[14] As determined by the Supreme Court at the time, "[g]iven the public health concerns and the necessity of taking action to slow the spread of the disease, the continuances serve the ends of justice and outweigh the best interest of the public and the defendant in a speedy trial."[15] As such, the Supreme Court expressly excluded the time periods of such continuances from speedy trial computations pursuant to Louisiana law, including but not limited to those set forth in the Louisiana Code of Criminal Procedure, because they presumptively constituted <u>just cause</u>.[16]

In this way, the entire machinery to process criminal justice cases became paralyzed in Louisiana for an extended time, but arrests for criminal offenses continued and front-loaded the system for processing criminal defendants to ELMHS. This circumstance was not due to any fault on the part of LDH. Further, the out-processing of criminal defendants from ELMHS was also necessarily suspended. Parish jails were no longer accepting transfers of restored criminal defendants, so they remained at ELMHS.[17] In April 2020, only one case could be discharged from ELMHS, while none could be discharged in May 2020.[18] As of June 2020, forty-one patients had been deemed by ELMHS as being competent and ready to be returned to their respective parish jails, but of these, only four could be discharged.[19] As an illustration of the situation that then

---

[14] *See* Louisiana Supreme Court Press Releases 2020-07 (April 6, 2020), 2020-10 (April 22, 2020), 2020-12 (April 29, 2020), and 2020-15 (May 15, 2020), and corresponding signed Orders, found at <u>https://www.lasc.org/PressRoom/2020</u> (last accessed on July 1, 2021).

[15] Louisiana Supreme Court Order (April 6, 2020), available at <u>https://www.lasc.org/COVID19/Orders/2020-04-06_LASC_order.pdf</u> (last accessed on July 1, 2021) and Louisiana Supreme Court Order (May 15, 2020), available at <u>https://www.lasc.org/COVID19/Orders/2020-05-15_LASC_Order.pdf</u> (last accessed on July 1, 2021).

[16] *Id.*

[17] Exhibit 1 – Declaration of Hampton "Steve" Lea; *See also* "Wallace M, Marlow M, Simonson S, et al., "Public Health Response to COVID-19 Cases in Correctional and Detention Facilities — Louisiana, March–April 2020," MMWR MORB. MORTAL WKLY. REP. 2020; 69:594–598, available at <u>http://dx.doi.org/10.15585/mmwr.mm6919e3external icon</u> (last accessed on July 6, 2021).

[18] Exhibit 1 – Declaration of Hampton "Steve" Lea.

[19] *Id.*

existed, on June 9, 2020, three of seven Parishes in LDH Region 4, two of five Parishes in Region 5, and all nine Parishes in LDH Region 7 reported to ELMHS that no transfers could be accepted whatsoever from ELMHS, regardless of COVID infection status.[20]

It was not until July 2020 that discharges for those to whom competency had been restored could regularly resume, with twenty-seven cases discharged from ELMHS during that month and thereby freeing placements for additional admissions.[21] However, the resumption of the admissions process was burdened by the necessity to follow recommendations and protocols for isolation, quarantine, and infection control as recommended by the Louisiana Office of Public Health (OPH) and the federal CDC brought on by the Public Health Emergency. The CDC continued to recommended prompt isolation of COVID-19 patients, a fourteen-day quarantine, and twice daily symptom-monitoring of exposed persons, and intensified cleaning and disinfection procedures. The CDC also recommended testing for all close contacts, including those without symptoms, and broader testing strategies to control transmission in such high-risk settings.[22]

Plaintiffs allege that LDH "failed to develop sufficient plans and procedures to adjust to the new realities of a world shaped by COVID-19,"[23] which is simply untrue.  Since the onset of COVID-19, LDH has all the while been developing plans and procedures to adjust to the new difficulties brought by the COVID-19 pandemic. To facilitate resumed admissions to ELMHS, OPH staff met with and advised staff at ELMHS based on the best knowledge at the time. Following CDC guidance, ELMHS identified space in the facility that could be dedicated to isolate

---

[20] Id. These parishes were St. Landry, St. Mary, and Iberia in LDH Region 4; Calcasieu and Beauregard in LDH Region 5; and Caddo, Bossier, Webster, Sabine, DeSoto, Claiborne, Bienville, Red River, and Natchitoches in LDH Region 7.

[21] Exhibit 1 – Declaration of Hampton "Steve" Lea.

[22] See Njuguna H, Wallace M, Simonson S, et al., "Serial Laboratory Testing for SARS-CoV-2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility — Louisiana, April–May 2020," MMWR MORB. MORTAL WKLY. REP 2020;69:836-840, available at: http://dx.doi.org/10.15585/mmwr.mm6926e2external icon (last accessed July 6, 2021).

[23] ECF No. 217-1, at p. 19.

and monitor transferred admittees for signs of COVID-19 infection.[24] ELMHS had plans to stand up a nineteen bed unit in its facilities for quarantine of male admittees and a smaller four-bed quarantine unit for female admittees in June 2020.[25] Yet the setting up of such units could not be done until a corresponding number of patients could be discharged.[26] Once set up, such units concomitantly further affected admissions flow to ELMHS because additional placements within the facility outside of these quarantine units had to be reserved and held vacant for each admittee to ELMHS undergoing quarantine so that each patient could be accommodated and placed upon completion of quarantine.[27] More simply put, whereas admittees prior to the onset of the COVID-19 pandemic required only single placements within ELMHS, each admittee from June 2020 and onward now removed two (2) placements within the facility from its overall capacity.[28] Meanwhile, as mentioned before, Parish jails in Louisiana were not accepting transfers from ELMHS as they were instituting their own pandemic protocols for infection control.

As early as June 10, 2020, ELMHS had formulated and drafted a plan to resume admissions to its facility and had presented that plan to OPH.[29] According to then existing CDC recommendations and guidance, patients were required to have two (2) negative COVID-19 test results, at least 24 hours apart, before being transferred or admitted to congregate settings.[30] Under the plan, ELMHS would provide two (2) negative test results upon discharging patients back to their Parish jails.[31] In turn, ELMHS required one (1) negative COVID-19 test result prior to

---

[24] Exhibit 1 – Declaration of Hampton "Steve" Lea.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Exhibit 2 – July 7, 2020 Email from Hampton "Steve" Lea to Epidemiologist Erica Washington, an LDH Healthcare-Associated Infections & Antibiotic Resistance Program Coordinator.
[30] Exhibit 3 – Declaration of Dr. Joseph Kanter. *See also* Defendant's Exhibit #4 - *Health Alert Network Message 20-37: Update: Testing for COVID-19 in Nursing Homes, Long-Term Care Facilities, and Other Congregate Settings* (May 29, 2020), and Exhibit 5 - *Preparing for COVID-19 in Nursing Homes* (May 29, 2020), pp. 5-6.
[31] Exhibit 6 – ELMHS Plan for Restarting Admissions.

accepting patients from Parish jails and the completion of a short screening questionnaire, followed by a COVID-19 test upon admission to an ELMHS isolation unit.[32] OPH approved the plan in July 2020 with the recommendation that admittees nonetheless be quarantined for observation for 14 days after the negative test upon admission to an isolation unit for development of signs or symptoms of COVID-19 infection.[33] With these protocols in place, the flow of admissions and discharges to and from ELMHS resumed until outbreaks in October 2020 and later forced further cessation of admissions for patient safety.

Parish jails constitute congregate settings subject to the same protocols as ELMHS recommended by the CDC and OPH to control the spread of disease. Thus, through this period, Parish jails could not accept patients back from ELMHS unless the detainees had been tested twice for COVID-19 with negative results, had not been exposed to active COVID-19 infection, and had completed an isolation and observation period under quarantine period for 14 days without signs or symptoms of the disease. Because of these protocols in place for the health and safety of detainees in Parish jails, ELMHS was unable to discharge clients to Parish jails at the same pace as prior to the COVID-19 Public Health Emergency once admissions and discharges were able to resume.[34]

Overall, the total number of NGRI clients discharged since the onset of the COVID Public Health Emergency stands at 24.[35] The total admission rates to and discharge rates from ELMHS for the time period of March 2020 to June 2021 for all cases at the facility are illustrated in the following table:[36]

---

[32] *Id.*
[33] Exhibit 2 – July 7, 2020 Email from Lea to Washington.
[34] Exhibit 1 – Declaration of Hampton "Steve" Lea.
[35] *Id.*
[36] *Id.*

| | Admits | Discharges | Breakdown of Discharges | | |
|---|---|---|---|---|---|
| | | | Jails | FSTRA[37] | Community |
| March-20 | 22 | 16 | 8 | 6 | 2 |
| April-20 | 0 | 1 | 0 | 0 | 1 |
| May-20 | 1 | 0 | 0 | 0 | 0 |
| June-20 | 3 | 4 | 2 | 1 | 1 |
| July-20 | 3 | 27 | 24 | 0 | 3 |
| August-20 | 23 | 28 | 24 | 3 | 1 |
| September-20 | 45 | 33 | 17 | 11 | 5 |
| October-20 | 11 | 25 | 16 | 6 | 3 |
| November-20 | 33 | 30 | 17 | 8 | 5 |
| December-20 | 29 | 23 | 14 | 7 | 2 |
| January-21 | 42 | 36 | 20 | 16 | 0 |
| February-21 | 23 | 19 | 9 | 6 | 4 |
| March-21 | 33 | 36 | 21 | 8 | 7 |
| April-21 | 48 | 41 | 21 | 14 | 6 |
| May-21 | 35 | 32 | 16 | 7 | 9 |
| June-21 | 30 | 24 | 8 | 12 | 4 |
| | **381** | **375** | **217** | **105** | **53** |

As discussed above, necessary public health measures, employing the then-existing guidance from the CDC and OPH, caused cessations of admissions to and discharges from ELMHS that created the current waitlist.

By comparison, the total admissions to ELMHS relating to this litigation for State Fiscal Year (SFY) 2017-2018[38] stood at 339.[39] The corresponding number for SFY 2018-2019 stood at 374.[40] Based on the monthly average of pre-COVID-19 admissions to ELMHS during SFY 2019-2020, the projected admissions to ELMHS relating to this litigation would have totaled approximately 408.[41] However, the total admissions instead came to 273, thus, showing the impact

---

[37] FSTRA stands for Forensic Supervise Transitional Residential & Aftercare Facilities. A FSTRA provides clients referred by forensic facilities or under court-ordered forensic conditional release with individualized services to develop daily living skills and to prepare for vocational adjustment and reentry into the community.
[38] The State Fiscal Year runs from July 1 to June 30 of the following year.
[39] Exhibit 1 – Declaration of Hampton "Steve" Lea.
[40] *Id.*
[41] *Id.*

of necessary public health protocols on flow to and from, as well as capacity at ELMHS.[42] The preliminary total number of admissions for SFY 2020-2021, and thus completely within the period of the COVID-19 Public Health Emergency, has been only 240.[43]

Every morning, seven days of the week, a multi-disciplinary team of ELMHS staff meets to discuss and address COVID-19 related issues within the facility.[44] For example, if a male patient is discharged from CRU[45] at ELMHS, the staff may move a male patient from ITU[46] to fill that void, and then may move another male patient from ASSA[47] to fill the ITU bed, thus resulting in the vacancy at ASSA for use by new admittees for isolation and quarantine.[48] This is the same process that ELMHS followed prior to COVID-19, and this process is still being followed today. The only difference in this bed-flow process since the onset of the COVID-19 Public Health Emergency and the restarting of admissions to ELMHS is that ELMHS staff additionally have to factor in the quarantine and monitoring period timeframe of 14 days once an admittee arrives onsite, slowing down the process.

To date, the CDC still recommends a full fourteen-day quarantine period for persons in correctional settings.[49] This quarantine process, necessary under the current Public Health Emergency, remains the largest obstacle for timely bed-flow to and from ELMHS. As it relates to

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] CRU is a 72-bed male unit comprised of four halls. The building has no closed units. Instead there are four wings that share one common dayroom area.

[46] IRU is a 92-bed unit comprised of four wards: two units of 20 beds each, one unit of 24 beds, and one unit of 28 beds. Females are housed in the top two units totaling 48 beds, and males are housed on the bottom two units totaling 44 beds.

[47] ASSA is a 75-bed male building comprised of four units of approximately 18 beds per unit. The male isolation and quarantine unit for ELMHS is set up in ASSA. *See* Defendant's Exhibit #6 ELMHS Plan for Restarting Admissions.

[48] Exhibit 1 – Declaration of Hampton "Steve" Lea.

[49] *See* "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (June 9, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts (last accessed July 6, 2021).

the Parish Jails, LDH has no authority or control over the facilities to increase capacity to better accommodate this process.

2.  Providing all NGRI or Incompetent Individuals a Behavioral Health Assessment within five (5) calendar days of notification of an order for inpatient treatment or an order of commitment.

In their *Motion to Enforce the Settlement Agreement*, Plaintiffs complain that LDH has failed to timely provide Behavioral Health Assessments for NGRI or Incompetent Individuals. Included in the Settlement Agreement was a provision that LDH would conduct BHAs by way of a face-to-face assessment by a psychiatrist, licensed psychologist, or District Forensic Coordinator (DFC) for mental illness and addiction problems within five (5) calendar days of notification of an order for inpatient treatment or order of commitment.[50] Prior to the COVID-19 pandemic, LDH was in substantial compliance with this agreed-to provision for the previous three (3) years and five (5) months the Settlement Agreement had been in place.

Due to COVID-19, beginning March 16, 2020, it became impossible and impractical for LDH to comply with the requirement that BHAs be conducted within five (5) calendar days from receipt of a court order. As a result of COVID-19, all jail visits were halted, meaning that DFCs and evaluating physicians were prohibited from entering the jails to conduct BHAs and competency restoration sessions.[51] The jails' lockdowns and restrictions on visitor access wholly disrupted the systems used for patient evaluation. In an effort to re-initiate timely BHAs, DFCs began inquiring with the jails about alternative methods of meeting with these clients, including suggestions for meeting via Zoom and FaceTime.[52] Although some jails tried to accommodate the requests, the jails' lack of extra computers to allow Zoom participation, along with the lack of

---

[50] ECF No. 203, at p. 7.
[51] Exhibit 1 – Declaration of Hampton "Steve" Lea and Exhibit 7 – Declaration of Michelle Duncan.
[52] Exhibit 7 – Declaration of Michelle Duncan.

extra jail personnel to facilitate these meetings, and a lack of meeting room accommodations for allowing DFC visits to the jails initially hindered performing BHAs by either Zoom or in person.[53] Slowly, some of the jails began to obtain the necessary technology and personnel to allow for Zoom visits as a viable alternative to in-person BHAs. However, timely completion of the BHAs was still significantly hindered because many of the jails with Zoom capabilities limited Zoom visits to certain days.[54] If a DFC was unable to see a client on those proscribed days/times, then the session was missed and could not be made up outside the allotted days.[55] Notably, if the jail had an outbreak of COVID-19, all visits to the jail were stopped, many times even Zoom sessions were halted.[56]  Around the Fall of 2020, some jails began to loosen restrictions on in-person visits, which allowed for increased compliance with the BHA provision of the Settlement Agreement. However, some jails, such as East Baton Rouge, Jefferson Parish, and Livingston Parish, continue to restrict DFC client visits to certain days, limiting the amount of time available to conducting BHAs, while Orleans Parish (OJC) continues to prohibit any in-person and face-to-face meetings.[57] The limitation imposed by the jails restricting DFC visits to only certain days of the week occasionally creates a short delay beyond the 5-day window for completing the BHA.

An example of the timeline for receiving the Order from the court through the completion of the BHA is as follows: ELMHS receives an order for competency restoration from the court. From there, the DFC has to make an appointment with the jail to meet with the client for purposes of conducting the BHA.[58] The DFC's initial interview of the client for the BHA takes about an hour.[59] In addition to a face-to-face assessment using the Brief Psychiatric Rating Scale (BPRS)

---

[53] Id.
[54] Id.
[55] Id.
[56] Exhibit 1 – Declaration of Hampton "Steve" Lea; and Exhibit 7 – Declaration of Michelle Duncan.
[57] Exhibit 7 – Declaration of Michelle Duncan.
[58] Exhibit 7 – Declaration of Michelle Duncan.
[59] Id.

and Cut down, Annoyed, Guilty, Eye opener-Adapted to Include Drugs (CAGE-AID), the BHA also requires the DFC to review the client's sanity commission report, medical and mental health history, jail medical and mental health records, whether the individual is receiving medication, whether the individual is compliant with that medication, efficacy and side effects of the medication, physical health needs, the extent to which he/she has already received jail-based competency restoration services, as well as an assessment other factors bearing on the acuity of the individual's needs for mental health and substance abuse treatment.[60] Following the DFC's initial BHA assessment of the client, a review of the information noted above, scoring of the assessment, the DFC prepares a summary of this information for Community Forensic Services (CFS)[61]. This entire process takes about three (3) hours for each client. Once the DFC's assessment is complete, it is transmitted to CFS and the consulting physician for a determination of whether the client is emergent or non-emergent. The consulting physician then meets with the client to confirm the DFC's recommendations. Once the consulting physician issues his/her opinion, the BHA is considered completed.

This detailed process is further restricted by limited space for conducting the assessments. East Baton Rouge Parish jail, for example, has one room available for conducting BHAs, whether by Zoom or, when allowed, in-person.[62] This means that only one BHA can take place at a time. Additionally, this limited space must also be used for Zoom court proceedings, which take priority over other meetings, as well as for BHAs, twice weekly competency restoration appointments, inmate visitation sessions with family members, defense attorneys, public defenders, and social workers, which are allotted on a first-come first-serve basis.[63]

---

[60] *Id. See also* ECF No. 203, p. 5.
[61] CFS is primarily tasked with the coordination of services rendered to clients with a forensic involvement.
[62] Exhibit 7 – Declaration of Michelle Duncan.
[63] *Id.*

Additional delays in timely performance of BHAs were also created by Hurricane Laura, which made landfall in Louisiana on August 27, 2020 and Hurricane Delta, which made landfall in Louisiana on October 9, 2020.[64] Consequently, the Calcasieu parish jail was closed on August 24, 2020, in anticipation of Hurricane Laura's landfall, and remained closed since due to the damage incurred by these two (2) hurricanes.[65] As a result, the inmates from Calcasieu Parish jail have been relocated to other jails throughout the state, requiring DFCs to locate those inmates and coordinate with new facilities outside of their region to conduct BHAs.[66]

LDH was allowed to resume BHAs in June 2020, whether by Zoom, in person, or otherwise. Even with the above road-blocks and restrictions in place, LDH resumed performing BHA's at a high rate of compliance. The compliance numbers for completed BHAs within five (5) days, reported to Plaintiffs by way of the monthly reports required by the Settlement Agreement are as follows:

| Month | BHA Compliance Rate - Incompetent | BHA Compliance Rate – NGRI |
|---|---|---|
| June 2020 | 16.6% | 0% |
| July 2020 | 76% | 100% |
| August 2020 | 84.6% | 100% |
| September 2020 | 91.6% | 100% |
| October 2020 | 85.7% | N/A – No court orders |
| November 2020 | 80% | 0%[67] |
| December 2020 | 100% | 100% |
| January 2021 | 92% | N/A – No court orders |
| February 2021 | 85% | 100% |
| March 2021 | 95% | 100%[68] |
| April 2021 | 76.9% | 100% |
| May 2021 | 87.9% | 100% |

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] This percentage resulted due to there being only one NGRI order and the physician review of the DFC's BHA was conducted one day beyond the 5-day time period.

[68] The only NGRI client with a court order in March 2021 was incorrectly noted as out of compliance on the reporting documents because of the 5-day period to conducted the BHA crossed over in months from the end of March to the beginning of April. However, as reported in a later report, this NGRI BHA was timely conducted.

Clearly, LDH has been working diligently to meet this requirement of the Settlement Agreement while operating under the unique conditions created by COVID-19.

    3.  <u>Creating New Placement Options at Clinically and Legally Suitable Locations</u>.

Plaintiffs argue that LDH has failed to create new placement options in clinical and community-based settings. However, in their own motion, Plaintiffs admit that LDH has addressed creating new placements by adding to the existing one at ELMHS, which is known as Secure Forensic Facility (SFF), Grace Outreach in New Orleans, and Harmony Transitional Services in Baton Rouge.

Since the implementation of the Settlement Agreement, LDH has followed a two-phased approach to create additional placement options to prevent unnecessary confinement.[69] In October of 2016, LDH implemented Phase I of its plan which expanded inpatient beds by forty (40), added twenty-six (26) at the Secure Forensic Facility (SFF). Phase I also added twenty (20) Forensic Supervised Transitional Residential and Aftercare facility (FSTRA) group home beds, with thirteen (13) thirteen beds placed at Grace Outreach in New Orleans and seven (7) at Harmony Transitional Services in Baton Rouge.[70] In April of 2018, LDH implemented Phase II of its plan which expanded fifty-two (52) inpatient beds at ELMHS and also added twenty (20) FSTRA beds at Harmony Transitional Center in Baton Rouge.[71]

But for COVID-19, LDH would still be in compliance of the Settlement Agreement with efforts made to increase clinical and community-based settings. However, due to COVID-19 outbreaks on the admission quarantine units and patient exposures, at the direction of the Louisiana Office of Public of Health, ELMHS admissions were halted on March 20, 2020 to July 14, 2020;

---

[69] Exhibit 1 – Declaration of Hampton "Steve" Lea.
[70] *Id.*
[71] *Id.*

October 8, 2020 to November 2, 2020; March 8, 2021 to March 22, 2021; and March 26, 2021 to June 3, 2021.[72] The halting of admissions due to COVID-19 outbreaks has delayed further efforts to create additional placement options since the pandemic is a statewide problem also affecting other facilities and the ability of each to expand beds.[73] LDH has contacted  non-licensed group homes as options for potential placement, however, due to the nature of the forensic population, this was not found to be a suitable option.[74] LDH is continuing efforts to find additional resources to eliminate the current backlog by creating new placement options to prevent unnecessary detention of NGRI and Incompetent Individuals in jail or confinement in mental health facilities.[75]

       4.   Impossibility of Performance.

      The unforeseeable and unprecedented nature of the COVID-19 pandemic makes performance by way of substantial compliance with the Settlement Agreement impossible. Under federal law, consent decrees, like the Settlement Agreement[76] in this consolidated case, are construed according to "general principles of contract interpretation."[77] Moreover, federal courts "look to state law to provide the rules of contract interpretation."[78] Under Louisiana law, an obligor is not liable for his failure to perform an obligation under a contract when it is caused by a fortuitous event that makes performance impossible.[79] In this context, a fortuitous event is an event that could not have been reasonably foreseen at the time the contract was made.[80] The Settlement Agreement in this case was signed by respective counsel for the parties on September 1, 2016.[81]

---

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] ECF No. 203.
[77] *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015); citing *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006).
[78] *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996).
[79] La. C.C. Art. 1873.
[80] La. C.C. Art. 1875.
[81] ECF No. 203, at pp. 20-21.

Despite all arguments of counsel, it remains that the severity and impact of the COVID-19 pandemic on Louisiana could not have been reasonably foreseen by counsel for Plaintiffs or by Defendants. The last pandemic of this scope occurred over a century ago with the Spanish Influenza epidemic of 1918-1920. LDH should not now be held liable for the impossibility of adherence to the mandated timelines for BHAs and regular and emergency admissions to ELMHS under the exigencies of the current, ongoing COVID-19 pandemic, especially where, as here, the alleged non-compliance resulted from necessary public health measures that LDH, through its offices and officers, is obligated to develop and implement for the prevention of disease for the citizens of Louisiana.[82]

## B. LDH Has Remained In Constant Communication With Plaintiffs Regarding The Status Of Compliance With The Settlement Agreement.

Prior to COVID-19, LDH provided monthly compliance reports to Plaintiffs as required by the Settlement Agreement. After the onset of COVID-19, LDH remained in regular and routine contact with Plaintiffs regarding their compliance status.

Throughout the pandemic, LDH has remained in contact with Plaintiffs via email communications and discussions via Zoom. LDH has continued to provide Plaintiffs with monthly compliance reports pursuant to the Settlement Agreement, and has also agreed to provide additional weekly COVID-19 patient data at Plaintiff's request. Further, LDH exchanged formal written correspondence with Plaintiffs regarding the status of compliance with the Settlement Agreement: on June 5, 2020;[83] September 3, 2020 (wherein LDH proposed extending the Settlement Agreement);[84] March 26, 2021;[85] and April 9, 2021.[86]

---

[82] La. R.S. § 36:251(B).
[83] Exhibit 8 – June 5, 2020 Letter from LDH to Plaintiffs.
[84] Exhibit 9 – September 3, 2020 Letter from LDH to Plaintiffs.
[85] Exhibit 10 – March 26, 2021 Letter from LDH to Plaintiffs.
[86] Exhibit 11 - April 9, 2021 Letter from LDH to Plaintiffs.

LDH engaged in phone conferences with Plaintiffs regarding the settlement agreement on May 28, 2020; June 19, 2020; September 9, 2020; November 30, 2020; January 5, 2021; and March 31, 2021. LDH has also engaged in extensive email communications with Plaintiffs, examples of just some being exchanged between Plaintiffs and LDH on the following dates:

| | |
|---|---|
| July 15, 2020 | December 31, 2020 |
| July 16, 2020 | February 25, 2021 |
| July 22, 2020 | March 22, 2021 |
| July 31, 2020 | March 29, 2021 |
| November 6, 2020 | April 2, 2021 |
| November 13, 2020 | April 9, 2021[87] |

These email exchanges listed above do not include LDH's emails to DRLA transmitting the monthly waiting list data or the weekly COVID-19 reports. In fact, many emails were exchanged between the parties regarding the provisions to be included in Plaintiffs' November 16, 2020 filing with this Court regarding the extension of the Settlement Agreement's reporting and monitoring provisions. Related to that filing, LDH agreed to engage in negotiations regarding the drafting of supplemental settlement agreement provisions related to issues arising from COVID-19.

Although the extension of the Settlement Agreement was approved by the Court on December 3, 2020, Plaintiffs chose to wait until the afternoon of Christmas Eve, December 24, 2020 at 2:11 p.m., to send LDH an email containing detailed questions regarding the waitlist procedures and the effects of vaccination on the waitlist procedures. In that email, Plaintiffs also demanded answers regarding: written procedures for how LDH is clearing the wait list including whether LDH includes considerations of infection positivity testing rate of sending parish, availability of testing to parish facilities, length of wait, court actions seeking movement of patients, the number of beds available for men and women being transferred to ELMHS, what criteria are considered for determining the number of beds, an estimated timeline of when LDH

---

[87] Exhibit 12 - Email communications between LDH and Plaintiffs, *in globo.*

will be in compliance with admission time limits, and any additional potential strategies to comply with the Settlement that LDH is considering.[88]

Plaintiffs fail to mention to this Court that LDH set up a meeting between their expert Dr. Dvoskin and ELMHS' Chief of Staff, Dr. John Thompson, which occurred on January 5, 2021 to answer DRLA's questions and discuss potential strategies for minimizing the effects of COVID-19, and for hearing Plaintiffs' ideas and suggestions for LDH's facilities.

## C.    **Plaintiffs Requests to Re-Open Discovery and for Additional Discovery Should be Denied or Not Entitled to the Additional Discovery Sought.**

The additional information that Plaintiffs wish to obtain from LDH via their request to this Court to re-open discovery in this matter is an extreme over-reach and should be denied. Plaintiffs are not now, and have never been, entitled to this information as part of the Settlement Agreement between the parties. Furthermore, some of the information requested does not exist in a reportable format.

### 1.    Plaintiffs are Not Entitled to the Additional Discovery Sought and Should Not be Allowed to Re-Open Discovery.

There is no basis for re-opening discovery in this matter, since LDH's Settlement Agreement compliance issues arise strictly from the COVID-19 pandemic. In support of their request for additional discovery, Plaintiffs claim that LDH has failed to provide them with waitlist information and has failed to engage in meaningful communications or negotiations. However, this is incorrect and misrepresentative. As stated above, LDH remained in regular contact with Plaintiffs, by way of multiple emails, conference calls, and formal written correspondence. Throughout these communications, the parties discussed issues caused by the pandemic that were affecting wait-times and efforts taken by LDH to minimize those wait-times and mitigate the

---

[88] Exhibit 13 - December 24, 2020 Email from Plaintiffs.

effects of the impositions caused by the COVID-19 pandemic. Furthermore, LDH has evidenced its willingness to work with Plaintiffs, in that LDH proposed and voluntarily agreed to extend the reporting deadline and monitoring period agreed to in the original Settlement Agreement by way of written correspondence to Plaintiffs on September 3, 2020[89], as memorialized in the Plaintiffs' *Unopposed Motion for Continued Reporting and Jurisdiction over the Settlement Agreement*.

Plaintiffs' complaint that LDH has failed to provide waitlist information is clearly misleading, since Plaintiffs have demonstrated they are in possession of such information by way of their argument to this Court setting forth detailed statistics on the LDH waitlist numbers in their motion requesting to re-open discovery. The data provided by Plaintiffs in their motion clearly came from the monthly reports provided to them by LDH.

Plaintiffs also urge this Court to re-open discovery on the basis that they have not received certain information from LDH, but the information complained of is not any which is required to be provided under the Settlement Agreement. For example, Plaintiffs argue that they have not been provided with vaccine education efforts. This is not information that LDH is required to provide under the Settlement Agreement. Further, LDH's vaccine information and education efforts are posted on the publicly available LDH website for anyone to research and review.[90] Plaintiffs complain they have not received information from LDH regarding efforts taken to identify less restrictive or non-congregate treatment settings for patients. This too, is not a requirement imposed on LDH under the Settlement Agreement, and consequently, Plaintiffs are not entitled to receive this information as part of LDH's compliance with the Settlement Agreement. Plaintiffs also cite the lack of repeat or follow-up BHAs as a basis for urging this Court to re-open discovery;

---

[89] Exhibit 9 - September 3, 2020 Correspondence from LDH to Plaintiffs.
[90] Vaccine information: https://covidvaccine.la.gov/; General COVID information: https://ldh.la.gov/Coronavirus/; and LDH Health Alert Network messages: https://ldh.la.gov/index.cfm/page/4109.

however, there is also no such requirement in the Settlement Agreement that an individual on the waitlist be subjected to multiple or repeat BHAs. As part of the Settlement Agreement, individuals on the waitlist are seen twice a week by LDH DFCs for competency restoration purposes. To require additional, follow-up BHAs would stretch an already thin workforce even tighter and impose additional time and accessibility constraints on the jails.

2.  Request to Re-Open Discovery Should be Denied due to the Impossibility of Complying with Settlement Agreement.

The unforeseeable and unprecedented nature of this COVID-19 public health pandemic makes substantial compliance with the Settlement Agreement an impossibility. In their motion, Plaintiffs argue that the failure to comply with a court order – even if unwillful – warrants the re-opening of discovery in this matter. Plaintiffs cite *Seven Arts Pictures, Inc.*[91] for the notion that "when a party violates a court order without objecting to it, asking the court to modify or vacate it, or even informing the court why it cannot or will not obey it, the court may hold the party in contempt without first deciding whether the disobedience was justified." However, unlike the defendant in *Seven Arts Pictures*, *Inc.*, LDH did engage with Plaintiffs and with this Court by of the *Unopposed Motion for Continued Reporting and Jurisdiction* on working towards a solution to the issues presented by COVID, and also engaged in settlement negotiations which were ultimately broken off by Plaintiffs' counsel.[92] Further, LDH engaged with plaintiffs and with this Court to inform the Court that the admission timelines could not be adhered to because of public health measures taken during the COVID pandemic.[93] LDH has, at all times, acted in good faith to maintain communications with Plaintiffs and has continuously provided information on the

---

[91] 512 F. App'x at 422.
[92] *See* EFC No. 208.
[93] *Id.*

status of compliance. The impossibility of full compliance makes the opening of discovery unnecessary in this matter.

### D.  LDH Has Acted In Good Faith At All Times

In their brief to the Court, Plaintiffs incorrectly and wrongfully accuse LDH of using stalling tactics and engaging in bad faith while negotiating the terms of a proposed supplemental settlement agreement. As indicated above, LDH has engaged in extensive communications with Plaintiffs regarding the waitlist, COVID-19, and terms of any supplemental settlement agreement, including coordinating the conference call between Dr. Dvoskin and Dr. Thompson.  On February 22, 2021, Plaintiffs provided LDH with their initial draft of a proposed supplemental settlement agreement, which was 25 pages long, and most of which was regarding the terms under which LDH would hire a contract consultant "with expertise in administration and financing of states' mental and physical health service", for the purpose of reviewing plans and reports and providing technical assistance to LDH.[94] LDH, through undersigned counsel, advised Plaintiffs' counsel during a phone call on March 4, 2021, that it would not agree to hire an outside contractor consultant, when LDH and ELMHS have full, unfettered access to the state's top medical official - State Health Officer and State Medical Health Director, Dr. Joseph Kanter.  During that call, LDH requested that Plaintiffs remove the contract consultant information from their proposed agreement and re-submit an updated proposal, since much of the original proposal centered around the consultant. Plaintiffs' instead urged LDH to respond to their proposal, so on March 26, 2021, LDH provided Plaintiffs' with written correspondence identifying items for inclusion in the supplemental settlement agreement to which it would agree.[95] On March 29, 2021, Plaintiffs responded by email demanding a more comprehensive response and insisting on a red-lined

---

[94] Exhibit 14 - February 22, 2021 Email from Plaintiffs
[95] Exhibit 10 - March 26, 2021 Letter from LDH to Plaintiffs.

version of their original proposed supplemental settlement agreement from LDH.[96] On April 9, 2021, LDH responded by written correspondence again stating that LDH would not agree to hire an outside consultant and requesting that Plaintiffs remove that language from the proposed supplemental agreement.[97] On April 22, 2021, Plaintiffs provided LDH with an updated red-lined proposal with references to the consultant removed.[98] On April 30, 2021, LDH responded that it would provide a response by May 7.[99] That same afternoon, Plaintiffs responded threatening to file a motion to re-open discovery and enforce the terms of the settlement agreement on May 10 if they did not receive a response from LDH.[100] LDH did, in fact, provide Plaintiffs with its proposed draft and red-lined version of the proposal on May 7, 2021, as agreed to.[101] However, once LDH did so, instead of responding to the proposed version, Plaintiffs ceased all communication with LDH. Rather than engaging in negotiation efforts, Plaintiffs instead filed their motion currently before this Court over one month later, on June 12, 2021.

For the foregoing reasons, Defendants, Dr. Courtney N. Phillips, Secretary of Louisiana Department of Health, and the Louisiana Department of Health, request that the Plaintiffs' *Motion to Reopen Discovery and Rule to Show Cause Why Defendants Should Not Be Held In Contempt* be denied.

Respectfully submitted,

**/s/  Erica Aguillard**
KIMBERLY SULLIVAN, La. Bar Roll No. 27540
JENNA GERMANY YOUNG, La. Bar Roll No. 25942
KRYSTAL AIRS BROWN, La. Bar Roll No. 31593
ERICA SCHIRLING AGUILLARD, La. Bar Roll No. 34753
RYAN ROMERO, La. Bar Roll No. 35987

---

[96] Exhibit 15 - March 29, 2021 Email from Plaintiffs to LDH.
[97] Exhibit 11 - April 9, 2021 Letter from LDH to Plaintiffs.
[98] Exhibit 16 - April 22, 2021 Email from Plaintiffs to LDH
[99] Exhibit 17 - April 30, 2021 Email from LDH to Plaintiffs.
[100] Exhibit 18 - April 30, 2021 Email from Plaintiffs to LDH.
[101] Exhibit 19 - May 7, 2021 Email from LDH to Plaintiffs

Louisiana Department of Health
Bureau of Legal Services
628 North 4th Street (70802)
P.O. Box 3836
Baton Rouge, Louisiana 70821-3836
(225) 342-8881 (Telephone)
(225) 342-2232 (Facsimile)
kimberly.sullivan@la.gov
jenna.young@la.gov
krystal.airsbrown@la.gov
erica.aguillard@la.gov
ryan.romero@la.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2021, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to CM/ECF systems. Notice of this filing will be sent to CM/ECF participants by operation of this court's electronic filing system.

**/s/ Erica Aguillard**