## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

BRANDON COOPER, et al.,

       Plaintiffs,

    v.

BRUCE D. GREENSTEIN, et al.,

       Defendants.

Case No. 3:14-CV-00507-SDD-RLB

*Consolidated with*

ADVOCACY CENTER and MONICA JACKSON,

       Plaintiffs,

    v.

BRUCE D. GREENSTEIN, et al.,

       Defendants.

Case No. 3:15-CV-00751-SDD-RLB

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### MOTION TO REOPEN CASES AND GRANT ADDITIONAL DISCOVERY

Plaintiffs filed these consolidated cases over a decade ago, alleging that Defendants violated Due Process, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act when they failed to timely admit people to Eastern Louisiana Mental Health System ("ELMHS") upon receipt of a court order for hospital-based competency restoration or treatment following a judgment of Not Guilty by Reason of Insanity.

Prior to settlement of these cases in 2016,[1] 22 people were jailed while they awaited admission for competency restoration—with 90% waiting longer than a week for admission and one waiting as long as 100 days.[2] Of the 87 NGRI acquittees who had spent time on the waitlist for admission to ELMHS from March 2013 through March 2016, 83 had been left in jails for over 30 days while awaiting transfer.[3] The settlement stipulated, among other things, that each person for whom the Louisiana Department of Health ("LDH") received a court order for pretrial competency restoration or NGRI commitment would be admitted to ELMHS within 15 days of receiving the order. Within five days of receiving such an order, LDH would complete for each patient a Behavioral Health Assessment ("BHA"), which would require an admission within 48 hours if the BHA identified emergent needs

During the month of November 2025—nine years into the settlement—122 people were on LDH's waitlist for admission into ELMHS for competency restoration or treatment following an NGRI judgment.[4] The 37 people who were admitted to ELMHS from the waitlist in November 2025 had languished in parish jails for an average of 78.5 days after LDH received a court order for their admission to ELMHS.[5] So, nearly a decade into the settlement, the wait-times for admission are even longer on average than before the settlement took effect, and the total number of people on LDH's waitlist for admission remains over 100.

---

[1] Settlement Agreement, *Cooper v. Gee*, No. 3:14-cv-00507-SDD-RLB, ECF No. 203, (Nov. 17, 2016).

[2] *See* Complaint at 3 ¶ 6, *Advocacy Center and Monica Jackson v. Kliebert*, No. 3:15-cv-00751-SDD-RLB, ECF No. 1 (Nov. 9, 2015).

[3] Pls. Stmnt. of Uncontested Facts, *Cooper v. Gee*, 3:14-cv-00507-SDD-RLB, ECF No. 158-3 at 5 ¶ 12 (March 16, 2016).

[4] Ex. 1, *LDH Report on Incompetent Detainees: Clients on Waiting List During 11/01/2025–11/30/2025*. In recent years, LDH provides two reports to Plaintiffs: one for those admitted to the "East" facility and one to "FFF" or Feliciana Forensic Facility. The numbers cited here are the total of these two reports.

[5] Ex. 2, Plaintiffs' calculations of wait time for admissions as of November 2025.

LDH has been noncompliant with the settlement agreement since the onset of the COVID-19 pandemic. Despite the entry of a supplemental stipulated order,[6] the filing of a one-year plan developed in conjunction with a stakeholder working group,[7] and LDH's recent contracting for 180 off-site beds to create more room at ELMHS for admissions from the waitlist, LDH is still unable to provide Plaintiffs with even an *estimate* of when they will achieve compliance with the settlement agreement—such estimate being an explicit requirement of the stipulated order.[8]

Throughout the settlement monitoring period, Plaintiffs have consistently demonstrated a willingness to work with LDH to avoid unnecessary litigation. But they cannot abide by the continuing lack of clarity on *how* and *when* LDH will reach compliance after so many years.

For these reasons, and as discussed more fully below, Plaintiffs move the Court to reopen this case and allow them additional discovery.

    **I.**       **Procedural and Factual Background.**

        **a.**   **Filing of the Litigation and Initial Settlement.**

In 2010, Plaintiff Disability Rights Louisiana (then operating as "the Advocacy Center") and W.B., a minor detained in Orleans Parish Prison, sued LDH in the Eastern District of Louisiana, alleging that LDH's failure to promptly take custody of pretrial detainees deemed incompetent to stand trial and remanded to LDH's care violated those detainees' due process

---

[6] ECF No. 240.

[7] ECF No. 257.

[8] ECF No. 240 at 13 ¶ 17(c) ("To monitor Defendants' efforts in light of conditions related to COVID-19, Defendants shall report the following information with the repots under Section IX of this Supplemental Stipulated Order: . . . (c). Estimated dates of substantial compliance with admission timelines under Paragraphs 810 of the Settlement."

rights.[9] The parties entered a permanent modified consent decree on Nov. 9, 2011,[10] under which LDH agreed to admit all Incompetent Detainees to ELMHS within a graduated period of two to thirty days, dependent upon the emergent needs of each detainee. The Consent Decree provided that the matter should be dismissed in three years if LDH substantially complied with its terms. In December 2014, Judge Vance dismissed the suit with prejudice following the requisite term of substantial compliance.[11]

While the admission times for Incompetent Detainees decreased during the term of the consent decree, delays in admission for those waiting in jails following an NGRI adjudication grew. As a result, Plaintiffs filed *Cooper v. Kliebert* in 2014. At the time he filed his complaint, Plaintiff Brandon Cooper had been waiting six months for his transfer to ELMHS.[12] The ten *Cooper* plaintiffs spent an average of 188.1 days in jail after their NGRI adjudication, waiting only to be transferred to ELMHS.[13] Of the 87 NGRI acquittees that had been identified from March 2013 through March 2016, 83 had been left in jails for over 30 days while awaiting transfer.[14]

In the year following the 2014 termination of the *AC I* consent decree, admission times for the Incompetent Detainees again grew longer. In November 2015, Plaintiffs Monica Jackson and DRLA filed a companion suit challenging wait times for individuals whom courts had

---

[9] *Advocacy Ctr. v. La. Dep't of Health and Hosps.*, 2:10-cv-01088-SSV-DEK, ECF No. 1 (E.D. La. Apr. 12, 2010) (hereinafter, "*AC I*"). The court later issued its preliminary injunction as a published opinion. *AC I*, 731 F. Supp. 2d 603, 627 (E.D. La. 2010).

[10] Consent Decree, *AC I*, No. 2:10-cv-1088-SSV-JCW, ECF No. 217-1 (E.D. La. Nov. 9, 2011).

[11] Dismissal Order, *AC I*, No. 2:10-cv-1088-SSV-JCW, ECF No. 260 (E.D. La. Dec. 8, 2014).

[12] *Cooper*, ECF No. 1 at 7 ¶ 32.

[13] Statement of Uncontested Material Facts, *Cooper*, ECF No. 158-3 at 4 ¶ 11.

[14] *Id.* at 5 ¶ 12.

deemed incompetent to stand trial and in need of restorative treatment at ELMHS.[15] At the time of filing, Ms. Jackson had been waiting over a month for transfer to ELMHS following the Orleans Parish Criminal District Court's order remanding her to LDH's custody.[16] Concurrent with the filing of this suit, Plaintiffs in *Cooper* and *AC II* sought to consolidate these cases. The Court ordered consolidation of these matters in February 2016.[17] After briefing on Plaintiffs' motion for partial summary judgment and motion *in limine* to exclude LDH's expert witness, the parties entered negotiations and ultimately agreed upon the consent judgment approved by this Court.[18]

In 2014, ELMHS contracted with LSU to conduct a bed-flow study to assess the number of additional beds that would be needed to resolve admissions backlogs for competency restoration and NGRI. The study, completed in 2015, informed LDH's plan to reach compliance with the Settlement Agreement.[19] In a June 2021 document assessing compliance issues with the Settlement Agreement, then-CEO of ELMHS, Hampton "Steve" Lea, noted that the number of court orders referring people to ELMHS for competency restoration or treatment following NGRI adjudication had far outstripped the bed-flow study's projections.

> Had this COVID crisis not occurred, ELMHS would have certainly remained compliant through the end of the 4-year period (November 2020). However, with the average number of referrals continuing to grow from 2016-2020, ELMHS would not have remained compliant long after November of 2020. ELMHS' risk of losing its ability to maintain compliance beyond the 4-year time period was predicted/indicated during the planning of Phases I and II.
> . . . .

---

[15] *Advocacy Center and Monica Jackson v. Kliebert*, 15-cv-751 (hereinafter *AC II*)

[16] *AC II*, ECF No. 1 at 6 ¶¶ 20–21.

[17] *Cooper*, ECF No. 149.

[18] ECF No. 203.

[19] Ex. 3, Hampton Lea Dep. 14:17–15:5 (Nov. 8, 2021).

> [T]he study's projected demand indicated approximately 374
> referrals for services in 2024. However, there were exactly 374
> referrals in 2018/2019; <u>five years ahead of the prediction</u>.[20]

### b. Entry of Supplemental Stipulated Order and the Stakeholder Workgroup Plan.

The parties agree that LDH was not in substantial compliance with the settlement beginning in March 2020, due in part to freezes in admissions to ELMHS necessitated by the COVID-19 pandemic.[21] In June 2021, Plaintiffs moved the Court for discovery and a rule to show cause why Defendants were not in contempt of the Settlement Agreement.[22] The Court granted Plaintiffs discovery in September 2021 and denied the Rule to Show cause without prejudice to Plaintiffs' later renewing their request for contempt based upon factual record developed in the discovery period.[23] Through the discovery process, it became clear that LDH's waitlist was steadily growing. For example, by May 10, 2021, the waitlist for competency restoration had grown to 63 people, 59 of whom had waited 30 days or more for a transfer to ELMHS following the court's order for treatment at the hospital.[24] Following the close of discovery, the Parties engaged in extensive negotiations. In April 2023, the parties jointly moved the Court to enter a Supplemental Stipulated Order intended to assist LDH in reaching compliance with the Settlement Agreement.[25]

---

[20] Ex. 4, Compliance Issues Regarding Cooper/Jackson Settlement agreement (emphasis in original, which was attached as Exhibit 1 to Lea Deposition); *see also* Ex. 3, Hampton Lea Dep. 17:2–21 (testifying to Lea's authorship of the document and approximate date of creation)

[21] Memorandum in Support of Unopposed Mtn. for Continued Reporting and Jurisdiction over the Settlement Agreement and Notice of Negotiations related to a Supplemental Agreement, *Cooper*, ECF No. 208-1 (Nov. 16, 2020).

[22] ECF No. 217.

[23] ECF No. 226.

[24] ECF No. 217-9, Exhibit 7, 5/10/2021 LDH Report on FFF Incompetent Detainees.

[25] ECF No. 238.

Among the Stipulated Order's provisions were more detailed monthly reporting requirements for LDH[26] and a requirement that LDH establish a stakeholder work group to explore less-restrictive, community-bed alternatives to admissions to ELMHS for these forensic patients.[27] LDH's monthly reporting to Plaintiffs required by the Settlement Agreement,[28] focused on details of the individuals on the waitlist, such as the date LDH received the order for their admission, the date LDH conducted their BHA, etc.[29] The additional reporting required by the Stipulated Order, however, included more systemic data points, like rates of admission, bed availability, and—particularly germane to this motion—the "estimated date of substantial compliance with admission timelines under Paragraphs 8–10 of the Settlement."[30]

The Stipulated Order required LDH to use the stakeholder working group's input to develop a one-year plan for implementation of the group's recommendations and to file that plan with the Court.[31] Furthermore, the Stipulated Order gave Plaintiffs the right to request specific information regarding LDH's implementation of the plan, subject to the enforcement provisions of settlement agreement.[32]

LDH filed the plan with the Court in August 2024.[33] The plan identified LDH's intent to contract with private entities to provide 180 inpatient psychiatric beds in three locations throughout the state. People currently in ELMHS custody because they are deemed unrestorably

---

[26] ECF No. 240 at 13–14 ¶ 17.

[27] ECF No. 240 at 8–13.

[28] ECF No. 203 at 11–12 ¶ 17.

[29] ECF No. 203 at 6 ¶ 4.

[30] ECF No. 240 at 13 ¶ 17(c).

[31] *Id.* at 12–13 ¶ 15(e).

[32] *Id.* at 12 ¶ 15(d) (incorporating Settlement Agreement ¶ 18).

[33] ECF No. 257.

incompetent[34] or under the civil commitment provisions of La. Revised Statutes title 28 were to be moved to these 180 new beds, making room for LDH to admit to ELMHS those competency-restoration and NGRI clients from the waitlist. The plan also specified that LDH would "consider a current bed-flow study . . . and/or other research models that may assist in the future planning of forensic community behavioral health resources."[35]

Since the entry of the Stipulated Order, LDH has not provided Plaintiffs an estimate of when it would return to substantial compliance—an estimate that should be included in each monthly report.

### c. LDH Has Not Shared Certain Information Required Under the Agreement.

On April 1, 2025, Plaintiffs emailed Defendants seeking more information on how and when LDH would come into compliance with the Settlement Agreement.[36] Plaintiffs noted that, while LDH reported that 96 of the projected 180 privately contracted beds had opened, an equal number of people on the waitlist had not been admitted into ELMHS. Plaintiffs understood that LDH was conducting renovations to the facilities where *Cooper* clients would be admitted and sought a status report on when this work would be completed and when LDH expected "to see a more significant reduction in the number of people on the waiting list."

Plaintiffs went on to note that the 178 people on the wait list in February 2025 was evidence of continued noncompliance with the settlement agreement, given the "substantial number of people who have been waiting for an appropriate admission for longer that the

---

[34] La. Code Crim. Proc. art. 648(B)(3).

[35] ECF No. 257 at 4–5.

[36] Ex. 5, Letter from Plaintiffs' Counsel to Defense Counsel (April 1, 2025).

maximum permitted time."[37] Plaintiffs then requested "more information regarding the specifics of LDH's plans to come into compliance":

> When does LDH anticipate compliance? Is it LDH's position that its current plan – increasing the availability of beds through the new facilities in Ferriday, Bastrop, and Bunkie – will alone be sufficient to maintain a maximum waiting time of no more than 15 days in non-emergency cases?
>
> We are also interested in information regarding any study that LDH plans to or has undertaken on this issue. Has LDH undertaken a process study to assess the adequacy of the Ferriday, Bastrop and Bunkie facilities to relieve the backlog or to determine what, if any, other steps are necessary to bring LDH into compliance? If LDH is planning to undertake or is currently undertaking such a study but has not completed it, please provide information about the timeline for such a study to be completed, the methodology and who will be involved.[38]

Having received no response to this request, Plaintiffs sent a follow-up letter on May 7, 2025, explicitly invoking paragraph 23 of the Stipulated Order and its provision for LDH to respond to Plaintiffs' request for information within a reasonable timeframe.[39] Plaintiffs re-urged the requests of their letter of April 1, 2025, and requested a substantive response by May 14, 2025.

On May 23, 2025, Defendants responded with an update on the timeline for renovations to ELMHS, but provided no estimate of when additional admissions facilitated by these renovations would result in substantial compliance:

> LDH does anticipate that increasing the availability of beds through new facilities will support the move toward compliance. Currently, 60 patients are now housed at Ferriday and 60 patients at Bastrop. LDH expects to transfer an additional 60 patients to Bunkie after it opens. LDH administration has made the increase

---

[37] *Id.*

[38] *Id.* at 2.

[39] Ex. 6, Letter from Plaintiffs' Counsel to Defense Counsel (May 7, 2025).

of patient bed availability a priority, in hopes to decrease the waitlist.[40]

Regarding bed-flow studies or other plans to assess the adequacy of the new facilities to address substantial compliance, LDH stated that it "does not plan to undertake a  study at this time."[41]

Plaintiffs replied on May 30, 2025, contending that Defendants' letter was unresponsive to the ultimate questions of how and when LDH would come into substantial compliance with the Settlement Agreement.[42] Plaintiffs therefore requested a detailed written statement from LDH to address various issues including when LDH expected to return to compliance with the admissions timeline required by the settlement agreement.

In the absence of a sufficient response, Plaintiffs expressed their intent to seek relief from this Court in the form of additional discovery or other relief the Court may deem necessary.[43]

Defendants responded on June 6 with answers to some of Plaintiffs' queries, but to the question of when Defendants would reach substantial compliance, Defendants stated "it is not possible to anticipate when LDH will return to compliance with admission timeline[s] required by the settlement agreement" because "the rate of patients being added to the waitlist does not correlate to the rate of patients being admitted."[44]

During a November 2025 meeting of the stakeholders group—months after the completion of ELMHS renovations and opening of all 180 new in-patient psychiatric beds as had

---

[40] Ex. 7, Letter from Defense Counsel to Plaintiffs' Counsel (May 23, 2025).

[41] *Id.*

[42] Ex. 8, Letter from Plaintiffs' Counsel to Defense Counsel (May 30, 2025).

[43] *Id.*

[44] Ex. 9,  Letter from Defendants to Plaintiffs' Counsel (June 6, 2025)

been set out in the plan filed with this Court[45]—Plaintiffs were informed that LDH had no plans to add additional in-patient capacity beyond the 180 beds that had been opened. Plaintiffs then requested additional information from Defendants. These requests included "an estimate of when LDH will reach compliance with the Cooper agreement's requirement of admission within 15 days following receipt of an order [and] [i]nformation on any discussions of or formal plans for reaching compliance in the event that demand for competency restoration beds were to increase from current levels."[46]

Defendants responded that "Defendants do not have a target date [for compliance] at this time."[47] As to the question of how LDH may be planning for increased demand, Defendants responded,

> The demand for both forensic and non-forensic mental health beds has been on the rise since Covid.  LDH does not anticipate a change in this trend any time soon.  LDH will continue to work to address the demand for these beds with the contract hospitals, FSTRA beds, jail based restoration programs, and community based services.[48]

### d. Present state of compliance.

As of the most recent reporting provided to Plaintiffs—reflecting the status of the waitlist and admissions for November 2025—the average wait time for admissions was 78.5 days. Some people waited far longer. Patient #98640 was ordered to ELMHS in February 2025 following an NGRI adjudication and waited nearly nine months in jail before being admitted to ELMHS on November 12, 2025.[49]

---

[45] ECF No. 257.

[46] Ex. 10, Email from Plaintiffs' counsel to Defendants' counsel (November 25, 2025).

[47] Ex. 11, Email from Defendants' counsel to Plaintiffs' counsel (December 11, 2025).

[48] *Id.*

[49] Ex. 1 at 2.

Of the 37 admissions among the 122 people wait-listed in the November reporting, only 9 were admitted within the 15-day timeline required by the consent judgment.

## II.    Legal Standard for Contempt and Post-Judgment Discovery.

District Court judges retain the power to enforce consent decrees entered in their cases.[50] "Courts possess the inherent authority to enforce their own injunctive decrees" and "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender."[51]

Plaintiffs, as movants, bear "the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order."[52]  Clear and convincing evidence is the "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to by established, evidence so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case."[53]

Plaintiffs need not demonstrate that the "contemptuous actions," or inaction, are willful, "so long as the contemnor actually failed to comply with the court's order."[54]  "When a party violates a court order without objecting to it, asking the court to modify or vacate it, or even

---

[50] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 432 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, that decree may be enforced.")

[51] *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (internal citations and quotations omitted).

[52] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *see also Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419, 422 (5th Cir. 2013).

[53] *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotes omitted).

[54] *Am. Airlines, Inc.*, 228 F. 3d at 581.

informing the court why it cannot or will not obey it, the court may hold the party in contempt without first deciding whether the disobedience was justified."[55]

In exercising its inherent authority to enforce a consent decree, the Court "has the discretion — indeed, the duty — to take immediate action in a manner coextensive with the degree of ongoing and persistent harm."[56] In addition to the Court's inherent power to enforce its judgments, the Federal Rules of Civil Procedure provide another basis for this Court to order post-judgment discovery.[57]

Further, post-judgment discovery has long been recognized as "an important tool to monitor a party's compliance with the court's order."[58] The reopening of a case and grant of discovery for purposes of confirming compliance with a consent judgment is a practice approved by multiple courts.[59]

---

[55] *Seven Arts Pictures, Inc.*, 512 F. App'x at 422.

[56] *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932243, at *8 (N.D. Cal. May 10, 2005).

[57] *See* Fed. R. Civ. P. 65, 69, 70; *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 138-39 (2014) ("The rules governing discovery in post judgment execution proceedings are quite permissive."); *Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905, 914 (S.D. Miss. 2016) ("Under Federal Rules of Civil Procedure 65 and 69, plaintiffs are entitled to reasonable discovery to enforce an injunction against the parties bound by that injunction.")

[58] *Caliste v. Cantrell*, No. 17-6197, 2020 WL 814860, at *3 (E.D. La. Feb. 19, 2020) (citing *Brumfield v. Dodd*, No. CIV.A. 71-1316, 2013 WL 360572, at *3 (E.D. La. Jan. 30, 2013)

[59] *See Alopex Indus. Inc. v. Seibel*, 61 F.3d 919 (Fed. Cir. 1995) (upholding a district court's finding of contempt and noting that plaintiffs had first moved the district court to reopen the case and grant them discovery to evaluate compliance with previously issued consent decree); *Sweeton v. Brown*, 944 F.2d 905 (table), 1991 WL 181751, at *3 (6th Cir. 1991) (noting that plaintiff class had been granted post-judgment discovery on compliance with consent judgment prior to moving for contempt); *Brumfield v. Dodd*, No. 71-1316, 2013 WL 360572 (E.D. La. Jan. 30, 2013) (compelling compliance with post-judgment discovery requests by U.S. Department of Justice to Louisiana Department of Education to determine compliance with consent decree in school desegregation matter); *La. Fish Fry Prods., Ltd. v. Corry*, No. 3:07-cv-1224-F-33TEM, 2010 WL 1544355, at *2 (M.D. Fla. Apr. 19, 2010) ("Plaintiff need only show good cause for the Court to allow discovery of any matter relevant to the subject matter of the action. Fed. R. Civ. P. 26(b)(1). Other courts faced with similar circumstances to the instant matter have granted motions to re-open discovery for the limited purpose of verifying compliance with consent judgments.").

### III.    Analysis.

#### a.    The 2016 Settlement Agreement and 2023 Supplemental Stipulated Order Entered by this Court Remain in Effect.

By the terms of the Supplemental Stipulated Order, this Court retains jurisdiction to enforce the Settlement Agreement until Defendants have maintained two years of substantial compliance, dated from the time at which the parties agree that Defendants have reached substantial compliance.[60] The parties agreed in the Stipulated Order that Defendants had not substantially complied with the Settlement Agreement since at least March 2020.[61] The Parties further agreed to a definition of substantial compliance:

> (1) no Incompetent Individuals or NGRI clients have waited longer than thirty days for transfer to ELMHS; (2) 90% of Incompetent Individuals or persons deemed NGRI are admitted to ELMHS within the applicable admission timeline under Paragraphs 8 or 9 of the Settlement (i.e., two (2) business days or fifteen (15) calendar days); and (3) 90% of Behavioral Health Assessments of Incompetent Individuals and NGRI occur within five (5) calendar days of receipt of an order for inpatient treatment or commitment—as required by Paragraph 6 of the Settlement.[62]

Since entry of the Supplemental Order, it has been undisputed that Defendants remain noncompliant. Defendants have not sought a declaration from the Court that they have reached substantial compliance—as would be their remedy under the Stipulated Order if the Parties disagreed as to the degree of their compliance.[63] The Settlement Agreement and Stipulated Order

---

[60] ECF No. 240 at 2 ¶ 3.

[61] *Id.* at 2.

[62] *Id.* at 3 ¶ 3(a).

[63] *Id.* at ¶ 4.

indisputably remain in effect.[64]

### b. The Settlement Agreement and Stipulated Order Required Certain Conduct by Defendants.

Once approved by the court, consent judgments operate as injunctions.[65] Here, in the section of the Settlement Agreement styled as "Actions Required of Defendants" the following tasks are enumerated:

- Admit all new NGRI or Incompetent Individuals with Emergency Mental Health Needs to a Mental Health Facility within two (2) business days following completion of a Behavioral Health Assessment.[66]

- Admit all NGRI or Incompetent Individuals to the forensic unit at ELMHS or other mental health facility, or to an appropriate community-based program within fifteen (15) calendar days following receipt of an Order.[67]

- Create new placement options, in addition to and not in lieu of current placement opportunities, at clinically and legally suitable locations – including community-based settings.[68]

---

[64] *See e.g.*, *Chisom v. Jindal*, 890 F. Supp. 2d 696, 710–11 (E.D. La. 2012) (finding terms of a settlement agreement remained in effect where the original agreement provided for continuing jurisdiction and no final judgment of compliance had been made).

[65] *See Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983) (citing *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir.1982)); *Carson v. Am. Brands*, 450 U.S. 79, 84 n. 9 (1981); *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir.1981) (en banc)); *see also, Chisom v. Jindal*, 890 F. Supp. 2d 696, 710–11 (E.D. La. 2012); *State Indus. Prod. Corp. v. Beta Tech. Inc.*, 575 F.3d 450, 457 (5th Cir. 2009) (holding that where a defendant was required to abide by certain terms and prohibited certain conduct pursuant to an agreement of the parties and the court retained jurisdiction to enforce the agreement, the consent judgement was injunctive in nature and subject to enforcement pursuant to Fed. R. Civ. Pro. 65).

[66] ECF No. 203 ¶ 8.

[67] ECF No. 203 ¶ 9. This paragraph also notes that under some exigent circumstances, the Defendants may have up to thirty calendar days to admit patients, but it is clear that admission times regularly exceeding fifteen (15) calendar days can trigger efforts to develop a remedial plan and / or enforcement.

[68] ECF No. 203 ¶ 15.

Furthermore, the Stipulated Order required LDH to provide Plaintiffs with monthly estimates of when they would reach substantial compliance and to respond to Plaintiffs' requests for information in a reasonably timely manner.[69] Thus, Defendants have specific affirmative obligations to undertake tasks designed to remedy underlying unconstitutional treatment delays.

### c. Defendants Remain Noncompliant with the Terms of the Agreement and Supplemental Stipulated Order.

While Defendants have made progress toward some goals outlined in the one-year plan—specifically the opening of 180 new contract beds—they remain greatly out of compliance with the 15-day admissions timeline required by the Settlement Agreement.

As noted above, in November 2025 there were 122 people on the waitlist, and those 37 who people who had been admitted into ELMHS from the waitlist that month waited an average of 78.5 days. Compare these waitlist statistics to December 1, 2016, not even a full month after the Settlement Agreement was entered, when there were only **7** pre-trial competency restoration people on the waitlist.

In addition to their noncompliance with these fundamental provisions of the Settlement Agreement, Defendants have not complied with the reporting and information-sharing provisions of the Supplemental Stipulated Order. Not only have Defendants failed to include in their monthly reporting an estimate of when they will reach substantial compliance, but also when specifically asked to provide such an estimate, Defendants seem to take the position that it is an *impossibility* to provide it. This is particularly concerning to Plaintiffs because demand for referrals to ELMHS has significantly outpaced past projections, as with the 2015 bed-flow study discussed above.

---

[69] ECF No. 240 at 13 ¶ 17(c).

It is unclear how much pent-up demand might be unleashed as wait-times begin to decline; i.e., given the lengthy wait-times for competency restoration over the last five years, how many criminal defense attorneys have actively avoided raising their clients' competency over concerns that they would unnecessarily expose them to longer periods of incarceration in local jails as they await treatment at ELMHS? Similarly, if large numbers of low-income people in Louisiana were to lose access to Medicaid and the behavioral health services it funds, would the criminal legal system see an influx of defendants presenting with competency issues? On July 24, 2025, the Trump administration issued an executive order titled *Ending Crime and Disorder on America's Streets*.[70] Among its policy prescriptions, the executive order requires the expansion of civil commitment to "shift homeless individuals into long-term institutional settings . . . [to] restore public order."[71]  How would an increased demand for civil commitments affect ELMHS capacity to admit NGRI and competency restoration patients?

To accurately assess whether LDH is on a path to substantial compliance, it is crucial for Plaintiffs to know if and how such assessments are being made and incorporated into existing plans for ensuring adequate space to timely provide the necessary treatment to these populations within the timeframes required by the Settlement Agreement.

### d.  Plaintiffs Should be Granted Additional Discovery.

Re-opening this case to grant additional discovery is warranted to monitor Defendants' compliance and to enforce the Settlement Agreement and Stipulated Order. Put simply, Plaintiffs must be able to determine how and when, *if at all*, Defendants' current plans will lead to substantial compliance.

---

[70] Ending Crime and Disorder on America's Streets, Exec. Order No. 14321, 90 Fed. Reg. 35817 (July 24, 2005).

[71] The executive order requires the secretaries of Housing and Urban Development and Health and Human Services to condition their grant making on state compliance with the goals of the executive order.

In a re-opened discovery process, Plaintiffs would seek records, documents, and a 30(b)(6) deposition relevant to Defendants' plan to reach substantial compliance. Plaintiffs' requests would explore issues including but not be limited to: current capacity and demand for hospital-based treatment of NGRI and pretrial competency restoration patients; projections of future demand and increases in capacity; given LDH's statements that it has no current plans to conduct a new bed-flow study or add additional bed capacity, the methods LDH used to determine future capacity needs; continued contracting and funding of the 180 beds operated by private contractors; and steps taken toward increasing the availability of community-based competency restoration to be used as an alternative option to jail-based or hospital-based restoration

## IV.    Conclusion.

Plaintiffs recognize that over the last year, Defendants have taken concrete steps to increase available bed space. Creating a number of hospital beds unmoored from any concept of how and when that number of beds will achieve the ultimate goal of ensuring that LDH achieves and maintains compliance with the admissions timelines in the Settlement Agreement, however, is insufficient assurance of progress toward compliance with Defendants' obligations. Reopening this case and granting additional discovery would permit Plaintiffs to assess whether it has become necessary to request this Court to hold Defendants in contempt and fashion additional relief.

Respectfully submitted,


/s/ Eric Foley
Eric Foley, Bar No. 34199
Elizabeth Cumming, Bar No. 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Ph: 504-620-2259
Fax: 504-208-3133
Eric.Foley@macarthurjustice.org
Elizabeth.Cumming@macarthurjustice.org

and

/s/ J. Dalton Courson
J. Dalton Courson, Bar No. 28542
Disability Rights Louisiana
8325 Oak Street
New Orleans, LA 70118
Ph: 504-522-2337 x 178
Fax: 504-273-6041
dcourson@disabilityrightsla.org

19